**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SRINIVASA SAI TEZA MUKKAVILLI,** | |
| Plaintiff, | |
| v. | Case No. 22-cv-2289 (TNM) |
| **UR M. JADDOU**, *Director, U.S. Citizenship and Immigration Services*, et al., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Indian national Srinivasa Sai Teza Mukkavilli invested nearly one million dollars in an equestrian center in rural America.  He did so for a shot at lawful permanent residency through the "investor visa" program.  But he has not received a visa.  So Mukkavilli sued the Director of the U.S. Citizenship and Immigration Services (USCIS) and the Secretary of State under the Administrative Procedure Act.  He argues that USCIS unlawfully withheld and unreasonably delayed his investor visa and petition for permanent residency.  Mukkavilli also argues that USCIS's decision to stop expediting various visa petitions was arbitrary and capricious.  Among other things, he seeks an order compelling the agency to adjudicate his visa petition within two weeks and vacatur of certain final agency actions.  The Government moves to dismiss.

The Court will grant that motion.  It lacks jurisdiction over Mukkavilli's claims that the agency is unlawfully withholding a rural visa number (Count I), adjudication of his permanent residency petition (Count II), and an investor visa number (Count III).  And Mukkavilli fails to

state claims for the rest: USCIS's denial of an expedite is committed to agency discretion by law (Count IV) and it has not unreasonably delayed adjudication of his investor visa petition (Count V).

## I.

### A.

First, some background on the investor visa program and how those visa petitions are processed. The Immigration and Nationality Act provides visas to immigrants who help create American jobs. *See* 8 U.S.C. § 1153(b)(5). Foreign investors can obtain visas several ways. One is to contribute to a USCIS-designated "regional center"—an entity that creates jobs indirectly through economic growth. 8 U.S.C. § 1153(b)(5)(E).

Congress established the regional center program as a five-year pilot. *See Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations Act of 1992*, Pub. L. No. 102-395, § 610(a) (Oct. 6, 1992) (previously codified at 8 U.S.C. § 1153 note). It set aside 300 visas a year for foreign investors who met certain criteria. *See id.* After its initial sunset, Congress periodically reauthorized the program until 2021. *See Da Costa v. Immigr. Inv. Program Off.*, No. 22-cv-1576, 2022 WL 17173186, at *2 (D.D.C. Nov. 16, 2022) (summarizing this history). But in June 2021, the program lapsed for nine months. *See id.*

Then, in March 2022, Congress revamped it. *See* EB-5 Reform and Integrity Act of 2022 ("Reform Act"), Pub. L. 117-103, 136 Stat. 1070 (2022) (codified at 8 U.S.C. § 1153(b)(5)). Apparently, some regional centers were fraudulent and raised national security concerns. *See, e.g.*, *Mirror Lake Vill., LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring) (noting these problems); *see also News Release, Grassley, Leahy Introduce New EB-5 Investor Visa Integrity Reforms* (Mar. 18, 2021), https://perma.cc/WB34-F743. So Congress

reformed the program, reauthorized it through 2027, and changed parts of the investor visa

process.  *See* 8 U.S.C. § 1153(b)(5)(E).

One change is particularly important here.  The Reform Act reserves percentages of visas

for three types of foreign investors:  twenty percent for investors in rural areas, ten percent for

investors in high unemployment areas, and two percent for investors in infrastructure projects.

*See id.* § 1153(b)(5)(B)(i).  In other words, the Act made it easier for investors who qualify for

one of these categories to get a visa.

**B.**

After making a qualifying investment, a foreign national may petition USCIS for

classification as an immigrant investor using an I-526 petition.  *See* 8 C.F.R. § 204.6.  Such

petitions must include evidence that the investor has put "the required amount of capital at risk

for the purpose of generating a return," supporting documentation, and fees.  *Id.* § 204.6(a), (j).

Those petitions are one of the first steps to becoming a lawful permanent resident.  *See Palakuru*

*v. Renaud*, 521 F. Supp. 3d 46, 48 (D.D.C. 2021).

Under the Reform Act, immigrant investors may file Form I-485 to obtain a green card at

the same time as Form I-526.  *See* Pub. L. 117-103, § 102(d), 136 Stat. 1070, 1075 (2022)

(amending 8 U.S.C. § 1255); *see also Green Card for Immigrant Investors*, USCIS,

https://perma.cc/67VK-6ZEW.  If USCIS approves these petitions, the immigrant is promoted to

"conditional" lawful permanent resident status for two years.  *See* 8 C.F.R. § 216.2(a); *see also*

*Wang v. USCIS*, 375 F. Supp. 3d 22, 26 (D.D.C. 2019).  After that waiting period, the investor

may petition for those conditions to be removed using yet another form if he has satisfied the

investment and job-creation requirements.  *See* 8 C.F.R. § 216.6.

But properly filing the investor visa petition is only half the battle.  There must also be a

visa available for the type of immigrant applying.  Often, the odds are slim.  A limited number of

employment-based visas are available each year, *see* 8 U.S.C. § 1151(d), and the same is true for

investor visas, *see id.* § 1153(b)(5)(A).  Complicating matters further, each country can claim

only seven percent of the available visas, regardless of demand.  *See id.* § 1152(a)(2).  In sum,

the number of investor visas is limited, and even if one is available, an immigrant may be out of

luck if too many of his countrymen have already claimed visas.

When demand exceeds supply for investor visas or for those from a given country,

applicants are put on a waiting list.  *See id.* § 1153(e)(3).  Each applicant in the queue is assigned

a "priority date"—typically the day on which he filed his petition.  22 C.F.R. § 42.54.  To help

applicants understand whether a visa may be available for those who filed when they did, the

State Department publishes a chart each month listing generic cut-off dates for categories of

petitions.  The January 2023 chart[1] reads:

| Employment-based | CHINA | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|
| 5th Unreserved (including C5, T5, I5, R5) | 22MAR15 | 08NOV19 | C | C |
| 5th Set Aside: Rural (20%) | C | C | C | C |
| 5th Set Aside: High Unemployment (10%) | C | C | C | C |
| 5th Set Aside: Infrastructure (2%) | C | C | C | C |

The bottom three rows correspond to the Reform Act's new categories for rural, high

unemployment, and infrastructure investors—visas are "reserved" for these investors.  As the

January 2023 chart indicates, visas remain "current" (marked with a C)—or available—under all

---

[1] This chart is lightly edited to remove irrelevant columns and rows.  *See Visa Bulletin for January 2023*, Dep't of State, https://perma.cc/Z94U-X2GT.

three categories.  The "5th Unreserved" category corresponds to all other investors.  And it has

cut-off dates for Chinese and Indian investors, indicating that investor visas have run out for

those countries, at least for now.  *See* 8 U.S.C. § 1153(b)(5)(B)(i)(II) (reserved visas not used

within two fiscal years will be made available to those in the unreserved category).

      An investor may access this chart to see whether a visa may be available for immigrants

like him.  First, the investor must figure out whether he is in the reserved or unreserved category.

Second, he must compare his priority date with the one listed in the chart.  If his priority date

falls *before* the cut-off date in the applicable box, visas remain available.  But if his priority date

falls after the cut-off date, the visa supply has run out.  If there is a "C" in the applicable box,

visas remain available for immigrants like him regardless of his priority date.

      For example, if an Indian national invested the required amount in a regional center and

successfully petitioned for an investor visa back in 2017, he would fall in the "unreserved"

category, which has a cut-off date of November 8, 2019.  According to the January 2023 chart,

visas are available for investors like him.  But if an Indian national invested *after* November 8,

2019, and does not qualify for one of the reserved categories, he is out of luck.

      Because USCIS processes petitions daily and updates its bulletin monthly, sometimes the

cut-off date moves backward or "retrogresses."  *See Adjudicative Review*, USCIS Policy Manual,

Vol. 7, Part A, Ch. 6, USCIS, https://perma.cc/CG9A-QTFR.  As USCIS explains, "[s]ometimes

[an immigrant visa number] that is current one month will not be current the next month, or the

cut-off date will move backwards to an earlier date . . . when the annual limit for a category or

country has been used up or is expected to be used up soon."  *Id.*  So unlike many other waiting

lists, having waited longer does not necessarily mean one is any closer to a visa.

      USCIS's approach to processing investor visas has also changed over time.  Historically,

it took a "first-in, first-out" approach—adjudicating investor visa petitions based on date filed. *See USCIS Adjusts Process for Managing EB-5 Visa Petition Inventory*, USCIS, (Jan. 29, 2020), https://perma.cc/A76G-J3GK ("Processing Announcement").  For example, a Chinese investor's petition filed on July 1 would be adjudicated before a Mexican investor's petition filed days later.

But this system made little sense if all the visas for China were already taken.  So to increase efficiency, USCIS shifted to an "availability approach."  *Id.*  Now, it prioritizes petitions from countries "where visas are immediately available, or soon available" based on those country limits it publishes monthly.  *Id.*  Thus, no matter who filed first, if visas are available for Mexico but not for China, the Mexican investor gets priority.  USCIS also considers whether it has already reviewed the underlying project.  *See Questions and Answers: EB-5 Immigrant Investor Program Visa Availability Approach*, USCIS, (Sept. 17, 2020), https://perma.cc/UTZ9-GGRK ("Questions and Answers").  USCIS implemented this processing change in March 2020 and applied it to all pending investor visa petitions.  *See* Processing Announcement.

Recall that the program authorizing visas for investors in regional centers lapsed for about nine months while Congress reworked it.  *See supra* Part I.A.  During this time, visa processing was placed on hold.  *See* USCIS, EB-5 Reform & Integrity Act of 2022 Listening Session at 4, https://perma.cc/G29S-QMPP.  After the Reform Act passed, USCIS resumed processing.  It informed investors that it would process pre-Act petitions based on the law and regulations in effect when they were filed.  *See EB-5 What's New*, Alerts, https://perma.cc/ST77-N7B6 ("EB-5 Alerts"); *see also Eligibility Requirements*, USCIS Policy Manual, USCIS, Vol. 6, Part G, Ch. 2, https://perma.cc/7BWV-837U ("Eligibility Requirements").  Relevant here, pre-Reform Act applicants are not eligible for the new visa set-asides, one of which reserves twenty percent of visas for investors in rural areas.  *See* 8 U.S.C. § 1153(b)(5)(B)(i).  This matters

because more visas are "current" (available) for investors in the Act's new set-asides.  *See, e.g.*, Visa Bulletin Chart.

## C.

Mukkavilli is an Indian national who invested in a USCIS-approved regional center.  *See* Am. Compl. ("Compl.") ¶¶ 1, 100, 122, ECF No. 11.  He claims he chose one in Appalachia called Tryon International Equestrian Center because its website boasted that USCIS was expediting its investors' visas.  *See id.* ¶¶ 100–03.  The web address Mukkavilli provides, *see* Compl. ¶ 82, is now defunct.  But the original website pledged "priority processing speeds" for those who invest in its regional center and cites promising statistics.  *See* EB-5 Fast, https://perma.cc/4S22-F5KH (cited in *Da Costa*, 2022 WL 17173186, at *9).  But it also includes several disclaimers in fine print.  *See id.*  For example, the website notes that past processing times are not indicative of future results, and that investment in the center "involves a high degree of risk of the loss of the investment[.]"  *Id.*

Based on the website's advertising, and despite the disclaimers, Mukkavilli invested nearly a million dollars in the regional center and applied for an investor visa in September 2020.  *See id.* ¶¶ 105, 122; *see also* Ex. A, ECF No. 1-1.  At that time, investor visas were "current" (available) for Indian nationals.  *See* Compl. ¶ 107; *see also Visa Bulletin for September 2022*, Dep't of State, https://perma.cc/KA2Z-J2LK.

Months later, Mukkavilli contacted USCIS to ask about the expedite Tryon advertised.  *See* Compl. ¶ 108.  USCIS responded that it had initially granted some expedites connected to the Center because of the impending 2018 World Equestrian Games.  *See* Ex. C, ECF No. 1-3 ("USCIS Letter").  But any additional expedites given after the Games were mistakes.  *See id.*; *see also* Compl. ¶ 109.  So USCIS rejected Mukkavilli's request for an expedite simply because

he is affiliated with the Tryon Center, but it informed him that he could apply for an expedite under other criteria.  *See* USCIS Letter; *see also* Def.'s Mot. to Dismiss (MTD) at 21, ECF No. 14 (citing *Requests to Expedite Applications or Petitions*, USCIS Policy Manual, Vol. 1, Part A, Ch. 5, https://perma.cc/W4BW-B5ZE).

In May 2022, while his investor visa petition was pending, Mukkavilli filed a Form I-485 to adjust his status to lawful permanent resident.  *See* Compl. ¶ 111.  At that time, the Visa Bulletin listed both the "reserved" and "unreserved" categories for Indian nationals as current— meaning visas were available.  *See Visa Bulletin for May 2022*, U.S. Dep't of State, https://perma.cc/MVL8-FZCC.  But between September and October 2022, USCIS's practice of reserving rural visas under the Reform Act's new set-asides changed the number of visas available in the "unreserved" category.  *See* Compl. ¶ 114.

Thus, Mukkavilli's visa petition was no longer current as of the October 2022 visa bulletin.  *See id.*  The October 2022 visa bulletin informed Indian nationals that if they had filed before November 8, 2019, no visas were available to them.  *Compare Visa Bulletin for September 2022*, Dep't of State, https://perma.cc/KA2Z-J2LK, *with Visa Bulletin for October 2022*, Dep't of State, https://perma.cc/JTW4-G9W8.  Because no visa is available for Mukkavilli—an Indian national in the "unreserved" category—USCIS is not acting on his petitions under its "availability approach" to processing.  *See* Compl. ¶ 129.  While Mukkavilli refers to this as an "adjudication hold policy," *see, e.g.*, *id.* ¶ 138, it is merely what happens to petitions when visas run out.

So Mukkavilli sued.  The core of his suit is that USCIS is unreasonably delaying a decision on his investor visa petition.  *See id.* ¶¶ 159–274 (Count V).  He also argues that USCIS is unlawfully withholding (1) a rural visa for him under the Reform Act's new set-asides, *see id.*

¶¶ 125–31 (Count I), (2) final adjudication of his adjustment of status petition, *see id.* ¶¶ 133–41 (Count II), and (3) adjudication of his investor visa petition if his adjustment of status petition is approved (Count III), *see id.* ¶¶ 142–49. Mukkavilli also contends that USCIS arbitrarily and capriciously cancelled its prior decision to expedite visas—including his own—for investors in Tryon. *See id.* ¶¶ 151–56. Finally, Mukkavilli seeks fees under the Equal Access to Justice Act. *See id.* ¶¶ 275–78.

The Government moves to dismiss for lack of subject matter jurisdiction and for failure to state a claim. The Court held a motions hearing, *see* Tr. of Mot. Hr'g (Hr'g Tr.), ECF No. 18, after which it ordered supplemental briefing, *see* Order, ECF No. 17; Gov't Suppl. Mem., ECF No. 19; Pl.'s Suppl. Mem., ECF No. 20. The Government's motion to dismiss is ripe.

## II.

Under Rule 12(b)(1), the Court presumes that a claim "lies outside [its] limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Plaintiffs bear the burden of overcoming that presumption by a preponderance of the evidence. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because subject matter jurisdiction implicates this Court's power to hear a claim, the Court gives the allegations "closer scrutiny" than would be required for a 12(b)(6) motion for failure to state a claim. *Nepal v. Dep't of State*, 602 F. Supp. 3d 115, 123 (D.D.C. 2022). And the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction[.]" *Jerome Stevens Pharma., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To defeat a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Id.*  While the complaint need not contain detailed factual allegations, it must provide more than a "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Courts "treat the complaint's factual allegations as true and . . . grant the plaintiff the benefit of all inferences that can be derived from the facts alleged."  *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).  But the Court credits neither legal conclusions couched as factual allegations, *see Iqbal*, 556 U.S. at 678, nor inferences unsupported by the facts of the complaint, *see Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006).  The Court may consider "any documents either attached to or incorporated in the complaint, and matters of which [courts] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.

The Government moves to dismiss both for lack of subject matter jurisdiction and for failure to state a claim.  First, it argues that Mukkavilli's unlawful withholding claims (Counts I–III) are not ripe, and that he fails to state a claim on Count I.  At the motions hearing and in supplemental briefing, the Government also argues that the Court lacks jurisdiction over Counts I–III because Mukkavilli fails to allege a discrete, required agency action.  Second, the Government avers that this Court lacks jurisdiction to review his claim that USCIS arbitrarily and capriciously cancelled expedites for certain EB-5 visas because the decision was discretionary (Count IV).  The Government also argues that Mukkavilli fails to state a claim on Count IV.  Third, the Government argues that Mukkavilli fails to state a claim for unreasonable

delay (Count V).  The Court addresses each argument in turn.[2]

## A.

The Government moves to dismiss Mukkavilli's claims of unlawful withholding (Counts I–III) on ripeness grounds.  "[A]n Article III court cannot entertain the claims of a litigant unless they are constitutionally and prudentially ripe."  *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999).  Constitutional ripeness—like standing—requires an injury that is ongoing or "certainly impending."  *Id.*

Prudential ripeness, on the other hand, prevents courts "from entangling themselves in abstract disagreements over administrative policies, [and] protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *In re Aiken County*, 645 F.3d 428, 433 (D.C. Cir. 2011).  To avoid such entanglement, courts balance their interests and those of the agency "in delaying review against the [plaintiff's] interest in prompt consideration of allegedly unlawful agency action."  *See id.* (cleaned up).  A motion to dismiss on ripeness grounds is analyzed under Rule 12(b)(1).  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

Recall that Mukkavilli argues that USCIS is unlawfully withholding (1) a rural visa number to him under the Reform Act's set-asides, *see* Compl. ¶¶ 125–31, (2) adjudication of his

---

[2]  The Court will grant the Government's motion to waive compliance with Local Civil Rule 7(n)'s requirement that it submit an index of the administrative record.  *See* MTD at 12 n.5; *accord Palakuru*, 521 F. Supp. 3d at 50 n.6 (collecting authorities explaining that an index is unnecessary in cases involving agency inaction).  While Mukkavilli claims he "reserves the right to add additional reasons" to his Complaint after the record is produced, the Court disagrees.  Production of the record is unnecessary to resolve the arguments in the Government's motion.  If Mukkavilli wishes to add to his Complaint, he must move for leave to amend.  *See* Fed. R. Civ. P. 15(a)(2); LCvR 7(i).

petition to adjust his status to lawful permanent resident, *see id.* ¶¶ 133–41, and (3) an investor visa number, *see id.* ¶¶ 143–49.  The crux of the Government's ripeness argument is that these claims are "wholly contingent upon future events, and thus do[] not present a live case or controversy."  MTD at 12–13.

According to the Government, there is no live case about whether USCIS is withholding a visa reserved for rural areas because "there has not been any final agency action" approving his initial investor visa petition—likely because no investor visas are available for Indian nationals who filed when he did.  *See id.* at 13.  So too for his adjustment of status petition and investor visa number.  *See id.* at 16–18.  On prudential ripeness, the Government suggests that this Court should let the administrative process run its course before issuing a decision.  *See id.* at 13.  The Court disagrees with both theories.[3]

Mukkavilli claims he was injured by USCIS's unlawful withholding of visa numbers. *See* Resp. to Def.'s Mot. to Dismiss (Pl.'s Resp.) at 1–2 & n.1, ECF No. 15.  The agency *inaction* is what inflicts his injury.  *Accord Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C. 2020) (agency inaction on diversity visas harmed plaintiffs); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (agency inaction in generating reports harmed organization that would use them).  And the Government cites no case, nor is this Court aware of any, holding that similar unlawful withholding claims are not constitutionally ripe.  Indeed, under the Government's logic, no case like Mukkavilli's would ever be ripe because all requests for visas hinge on future events.

More, unused reserved visas will flow back into the unreserved visa category after two

---

[3] The Government was unclear in its briefing and during the motions hearing whether it argues constitutional or prudential ripeness.  *See* MTD at 11–13, 16–17; Hr'g Tr. at 32–33.  So the Court addresses both.

years.  *See* 8 U.S.C. § 1153(b)(5)(B)(i)(II).  So as the Government conceded at oral argument, while there is no visa available for Mukkavilli now, there may be in the future.  *See* Hr'g Tr. at 35.  That admission further undercuts the argument that Counts I–III are constitutionally unripe.

The Government's passing reference to prudential ripeness fares no better.  This case presents no abstract disagreements over administrative policies.  *See, e.g.*, *In re Aiken County*, 645 F.3d at 436 (finding issue prudentially unripe because various contingencies regarding a license application, and the agency's position on it, will be resolved in the future).  And whether or not the Government is unlawfully withholding something from Mukkavilli is "a purely legal question, [which] is presumptively reviewable."  *Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003).

More, Mukkavilli challenges the inner workings of the administrative process for visa petitions, so there is no prudential reason for the Court to wait until the administrative decision "has been formalized and its effects felt in a concrete way by the challenging parties."  *Wyo. Outdoor Council*, 165 F.3d at 50.  Mukkavilli is already feeling the effects of the alleged unlawful withholding.  *See, e.g.*, Compl. ¶¶ 120–22, 130.  For these reasons, the Court will decline the Government's invitation to dismiss Counts I–III on ripeness grounds.

**B.**

Still, the Court has a duty to ensure that it has subject matter jurisdiction.  *See Penkoski v. Bowser,* 548 F. Supp. 3d 12, 28 (D.D.C. 2021).  And it finds that it lacks subject matter jurisdiction over Mukkavilli's unlawful withholding claims for a different reason.

Under the APA, this court may "compel agency action unlawfully withheld."  5 U.S.C. § 706(1).  But an unlawful withholding claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah*

*Wilderness All.*, 542 U.S. 55, 64 (2004) (reversing lower court finding of subject matter jurisdiction). This "limitation . . . rules out judicial direction of even discrete agency action that is not demanded by law . . . [or] agency regulations[.]" *Id.* at 65 (cleaned up). As the Supreme Court has explained, this provision of the APA "carried forward" the traditional writ of mandamus remedy. *Id.* at 63. And the mandamus remedy "was normally limited to enforcement of a specific, unequivocal command, [and] the ordering of a precise, definite act . . . about which an official had no discretion whatever." *Id.* (cleaned up).

The D.C. Circuit evaluates APA unlawful withholding claims and mandamus claims using the same standard. *Compare Norton*, 542 U.S. at 63–64, *with In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). This makes sense because unlawful withholding and mandamus claims seek the same remedy: an order that USCIS take a discrete, legally required action. *Cf.* Compl. ¶¶ 280, 281, 283 (asking the Court to compel USCIS to take various actions related to Mukkavilli's visa petitions). To show that he is entitled to such an order, Mukkavilli must demonstrate "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Unless all these requirements are met, "a court must dismiss the case for lack of jurisdiction." *Id.*; *see also* Gov't Suppl. Mem. at 3–7.

As the Circuit recently emphasized, the "clear and indisputable right to relief and clear duty to act standards are . . . stringent." *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023). To meet them, Mukkavilli must show that a law commands the relief he seeks, not merely authorizes it. *See id.* And even if he can establish the "clear duty to act" requirement, separation of powers concerns may still inhere. *See id.* at 715. Thus, courts must "carefully examine

14

precisely what form of relief is sought by a plaintiff to determine whether it seeks reallocation of government resources or some other action that is ordinarily beyond the power of mandamus." *Id.*

Mukkavilli has not shown that he has a clear and indisputable right to relief for Counts I–III, or that USCIS is violating a clear duty to act. *Cf. Skalka v. Kelly*, 246 F. Supp. 3d 147, 153 (D.D.C. 2017) (holding that immigrants failed to show that agency action on their visa petitions was unlawfully withheld). Therefore, the Court will dismiss these claims for lack of subject matter jurisdiction. *Accord Ferriero*, 60 F.4th at 713; *Beshir v. Holder*, 10 F. Supp. 3d 165, 171 (D.D.C. 2014); *Uranga v. USCIS*, 490 F. Supp. 3d 86, 98–101 (D.D.C. 2020).

### 1.

Mukkavilli alleges that USCIS is unlawfully withholding a rural visa number from him. *See* Compl. ¶¶ 125–31.[4]  Recall that Mukkavilli applied for an investor visa before the Reform Act passed. *See id.* ¶ 105; *see also supra* Part I.C.  Recall too that the Reform Act allocated twenty percent of visas for rural investors, but that once the agency resumed its processing, it used pre-Act standards for pre-Act petitions. *See* EB-5 Alerts; *see also* Eligibility Requirements (describing different standards for pre-Act petitions).  In other words, pre-Reform Act filers—including Mukkavilli—do not qualify for the new rural set-aside.

While Mukkavilli contests the wisdom of this policy choice, he does not show that he has a clear and indisputable right to a rural visa number, or that USCIS is violating a clear duty to act by not issuing him one. *See Norton*, 542 U.S. at 65.  Mukkavilli asserts that USCIS's choice not

---

[4]  Mukkavilli refers at times to a "high unemployment area[]" visa.  If Mukkavilli is arguing he is also entitled to a "targeted employment area" visa under the Reform Act, *see* 8 U.S.C. § 1153(b)(5)(D)(viii) (defining such areas as "rural" or one designated as high unemployment), that claim fails for the same reasons stated in Part III.B.1.  For clarity, the Court simply refers to a rural visa for Count 1.

to consider his visa application under the Reform Act's new rural category "misreads the statute and violates congressional intent."  Compl. ¶ 127.  But nothing in the Reform Act mandates that USCIS issue him a rural visa number.  Nor does he show he had an indisputable right to such a number in the first place.

On the contrary, as the Government points out, the Reform Act's new categories apply only prospectively.  *See* MTD at 15.  This Court recently held as such.  *See Del. Valley Reg'l Ctr., LLC v. DHS*, No. 23-cv-119, 2023 WL 3863637 (D.D.C. June 7, 2023).  It incorporates the reasoning of that opinion by reference and notes a few highlights.

The Reform Act contains many indicators that it applies prospectively.  Consider first the effective dates sprinkled throughout the Act.  In the EB-5 visa reform section—which contains the new set-aside categories—Congress stated that "[t]he amendments made by this section shall take effect on the date of the enactment of this Act."  Pub. L. 117-103, § 102(e), 136 Stat. 1070, 1075 (2022) (codified at 8 U.S.C. § 1153 note).  And in the section reauthorizing and reforming the regional center program, Congress stated that "[t]he amendment made by this subsection shall take effect on the date that is 60 days after the date of the enactment of this Act."  *Id.* § 103(b)(2), 136 Stat. 1070, 1100 (codified at 8 U.S.C. § 1153 note).

Other courts have noted that similar effective dates are probative (indeed, sometimes conclusive) evidence of solely prospective application.  *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257–58 (1994) (explaining that a similar statement "does not even arguably suggest that it has any application to conduct that occurred at an earlier date"); *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 940 (D.C. Cir. 2009) (finding that a delayed effective date was dispositive).

16

More, the Reform Act explains in one provision that pre-Act standards apply to pre-Act filers.  Investors seeking to "pool" their investments "shall file for classification" under two different statutory sections depending on whether they filed "before [or after] the date of the [Reform Act's] enactment[.]"  *Id.* § 105(a), 136 Stat. 1070, 1103 (codified at 8 U.S.C. § 1154(a)(1)(H)).  And that new section of the Act "shall apply to any petition . . . that is filed with the Secretary of Homeland Security on or after the date of the enactment of this Act."  *Id.* § 105(b), 136 Stat. 1070, 1103 (codified at 8 U.S.C. § 1154 note).

These changes, and others, are a clean break from the prior regime.  The best reading of the Reform Act is that it overhauled the regional center program, setting aside new percentages of visas and raising the financial stakes to qualify for them.  *See Del. Valley Reg'l Ctr.*, 2023 WL 3863637, at *2, 9.

A default rule of interpretation confirms this reading.  Statutes typically only cover conduct after their enactment.  So too for immigration regulations.  *See Sage IT v. Cissna*, 314 F. Supp. 3d 203, 208 (D.D.C. 2018) (rejecting claim that new USCIS regulation should apply retroactively).  This presumption against retroactivity is "deeply rooted in our jurisprudence" because "fairness dictate[s] that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."  *Landgraf*, 511 U.S. at 265–66.

To be sure, the presumption typically applies to protect the objecting party from interference with their "substantive rights, liabilities, or duties[.]"  *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).  While there is no need to protect USCIS, retroactive application could harm post-Act investors because fewer reserved visas would be available to them.  *Accord Del. Valley Reg'l Ctr.*, 2023 WL 3863637, at *10.  In any event, Mukkavilli presents no evidence rebutting the presumption against retroactivity.  Indeed, he does not

meaningfully engage with USCIS's textual and structural arguments on this point.  Instead, he claims that the agency's retroactivity argument is a post-hoc rationalization for its prior actions, which it failed to reasonably explain.  *See* Pl.'s Resp. at 7.  The Court disagrees.  Whether the Act applies only prospectively is relevant to whether Mukkavilli can show an entitlement to its set-asides.

In sum, Mukkavilli must show that he has a clear and indisputable right to qualify for the Act's rural visa set-aside.  *See Norton*, 542 U.S. at 65.  Because he fails to do that, the Court will dismiss Count I for lack of subject matter jurisdiction.  *Cf. Ferriero*, 60 F.4th at 713.[5]

## 2.

Similarly, Mukkavilli alleges that USCIS is unlawfully withholding adjudication of his adjustment of status petition and withholding an investor visa number.  *See* Compl. ¶¶ 133–41, 143–49.  Mukkavilli alleges that a decision to adjust his status or issue a visa number is discrete and that USCIS "has a non-discretionary duty to make a decision" on it.  *Id.* ¶¶ 133–34, 143.  Yet in support he points only to general regulations governing adjustment-of-status applications and statutory silence.  *See, e.g.*, *id.* ¶¶ 27–29; Pl.'s Resp. at 8–15; Pl.'s Suppl. Mem. at 2–4.

First, the regulations.  Mukkavilli states that "regulations independently and collectively demonstrate a decision on [his petition] is required."  *Id.* ¶ 30.  But their text belies that conclusory claim.  These regulations merely grant USCIS jurisdiction to decide such petitions, *see* 8 C.F.R. § 245.2(a)(1), and specify steps the agency must take if it approves or denies the

---

[5] USCIS also moves to dismiss Count I for failure to state a claim under Rule 12(b)(6) for the same reasons just discussed:  that the Act does not apply retroactively.  *See* MTD at 13–16.  Mukkavilli merely alleges, without further explanation, that USCIS's refusal to give him a rural visa number "is unlawful because it misreads the statute and violates congressional intent."  Compl. ¶ 127.  But the Court need not credit such conclusory assertions.  *See, e.g.*, *Iqbal*, 556 U.S. at 678.  Thus, 12(b)(6) is an independent basis for dismissal of Count I.

application, *see id.* § 245.2(a)(5); *see also id.* §§ 103.2(b)(19), 103.3.  They impose no clear duty on USCIS.  *Cf. Beshir*, 10 F. Supp. 3d at 173 (finding no duty for USCIS to adjudicate adjustment of status petitions).

Next, the statute.  Mukkavilli claims that 8 U.S.C. § 1255(a) supports his unlawful withholding claims.  *See* Pl.'s Resp. at 9–10, 12–17; *see also* Pl.'s Suppl. Mem. at 3–5.  This is so because it does not require a visa to be immediately available when USCIS adjudicates an adjustment of status application.  *See, e.g.*, Pl.'s Resp. at 9.  Based on that statutory silence, Mukkavilli spins out an argument based on § 1255(a)'s structure and history, concluding it was Congress's intent to "knowingly reject[] the requirement to have a current visa number at approval."  *See, e.g.*, *id.* at 13–15.  The Court declines to draw inferences about Congress's intent, especially where those inferences stem from statutory silence.  *See, e.g.*, *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496–97 (2022).  And the text of § 1255(a) includes no mandatory duty to issue decisions on adjustment of status petitions.  *See* 8 U.S.C. § 1255(a).  Quite the opposite.  It states that an alien's status "may be adjusted by the Attorney General, in his discretion" if he meets certain requirements.  *See id.*

Finally, Mukkavilli argues that "[w]here Congress has specifically provided a deadline for performance, courts in the Ninth Circuit enforce it."  Compl. ¶¶ 136, 145.  Perhaps.  But he points to no deadline by which USCIS must act on his adjustment of status petition or issue him an investor visa number.  Thus, even if the non-binding cases he cited were persuasive, he would still lose.

A decision on an adjustment of status petition—for Mukkavilli or any other immigrant—is a matter of agency discretion, not something demanded by law.  *See Norton*, 542 U.S. at 65.  Mukkavilli points to no statute or regulation mandating that USCIS act on his adjustment of

status petition or to issue him an investor visa number.  *See id.* at 66.[6]  Thus, the Court lacks

jurisdiction over Counts II and III.  *Cf. Ferriero*, 60 F.4th at 713; *Beshir*, 10 F. Supp. 3d at 173.

## C.

Next up is Mukkavilli's claim that USCIS arbitrarily ended expedites for the regional

center in which he invested.  *See* Compl. ¶¶ 151–56.  The Government argues that the Court

lacks jurisdiction over this claim because the decision was committed to agency discretion by

law, and, alternatively, that he fails to state a claim.  *See* MTD at 19–22.  The Court agrees that

Mukkavilli fails to state a claim.[7]

Recall that USCIS expedited some visas tied to the Tryon Center.  *See, e.g.*, Compl.

¶¶ 100, 183; USCIS Letter.  It apparently did so to help complete the center before the 2018

World Equestrian Games.  *See* USCIS Letter.  But USCIS also explained that it mistakenly

continued expediting some investor visas after the 2018 Games.  *See id.*  Mukkavilli now claims

that its decision not to expedite his 2020 petition was arbitrary and capricious for various

---

[6]  Mukkavilli also argues that USCIS's "adjudication hold policies" are unlawful.  Compl.
¶¶ 133, 137.  Recall that the agency has no such policy.  *See supra* Part I.C.  Rather, under its
availability approach to processing, USCIS puts visa petitions from oversubscribed countries on
the back-burner to allow it to process petitions more efficiently.  *See id.*  More, Mukkavilli claims
that the "policy" is illegal because it "contravenes Congressional intent."  Compl. ¶¶ 138, 147.
But he never explains why, and the Court need not credit such conclusory allegations, especially
given that no such policy exists.

[7]  The D.C. Circuit has held that a complaint seeking review of an action committed to agency
discretion by law under 5 U.S.C. § 701(a)(2) "has failed to state a claim under the APA and
therefore should be dismissed under Rule 12(b)(6)," not Rule 12(b)(1).  *See Sierra Club v.
Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011); *Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir.
2009).  There is some tension between these holdings and the Supreme Court's decision in
*Norton v. Southern Utah Wilderness Alliance*, which holds that to have subject matter jurisdiction
over an "unlawful withholding" claim under 5 U.S.C. § 706(1), one must allege a discrete, non-
discretionary duty.  *See* 542 U.S. at 63–64; *see supra* Part III.B.1.  The inverse of a non-
discretionary duty is that an action is discretionary, implicating § 701(a)(2).  It seems strange that
these provisions—almost two sides of the same coin—are governed by different standards.  But
the Court need not resolve this incongruity to decide the § 701(a)(2) and § 706(1) claims here.

reasons.  *See* Compl. ¶ 154.  He insists that USCIS disregarded his reliance interests, did not

engage in reasoned decision-making or allow him to respond, and offered a pretextual reason for

rescinding the expedite.  *See id.*

 While many final agency actions are reviewable under the APA, this Court may not

review one that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *see also*

*Heckler v. Chaney*, 470 U.S. 821, 829 (1985).  An action is committed to agency discretion if a

statute provides "no meaningful standard against which to judge the agency's exercise of

discretion."  *Chaney*, 470 U.S. at 830.  This is so because courts lack a "concrete limitation[] to

impose on the agency's exercise of discretion."  *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d

151, 156 (D.C. Cir. 2006) (cleaned up).

 To evaluate whether an action is committed to the agency's discretion, this Court

considers "both the nature of the administrative action at issue and the language and structure of

the statute[.]"  *Id.*  Mukkavilli points to no statute that authorizes USCIS to expedite investor visa

petitions.  *See generally* Compl.  Indeed, at times he argues that USCIS acted unlawfully by

expediting at all.  *See, e.g.*, *id.* ¶ 222; *see also* Hr'g Tr. at 12–13.

 Regardless, such a decision is committed to agency discretion by law.  *See* MTD at 20–

22.  The Reform Act's predecessor—which governed when Mukkavilli petitioned—states that the

Secretary "may give priority to petitions filed by aliens seeking admission[.]"  Pub. L. No. 102-

395, § 610(d) (Oct. 6, 1992), as amended by Pub. L. 108-156 (Dec. 3, 2003) (repealed Mar. 15,

2022).  And the Reform Act includes similar language, explaining that the Secretary "may

process petitions in a manner and order" he establishes.  *See* Pub. L. 117-103, § 103(b)(1), 136

Stat. 1070, 1075 (2022) (codified at 8 U.S.C. § 1153(b)(5)(E)(ii)).

 Both versions suggest that the decision to expedite a petition—or not—is committed to

the Government's discretion.  The "usual presumption is that 'may' confers discretion." *Zhu v. Gonzalez*, 411 F.3d 292, 295 (D.C. Cir. 2005) (cleaned up); *see also Citizens for Responsibility & Ethics in Wash. v. FEC*, 892 F.3d 434, 439 (D.C. Cir. 2018) (explaining that "the word 'may' imposes no constraints on the [agency's] judgment").  And the Circuit has held that similar provisions commit decisions to agency discretion, shielding them from judicial review.  For example, it found that the Attorney General has "complete discretion" to waive requirements for work visas where the statute states he "may" "waive the [statutory] requirements" "when [he] deems it to be in the national interest[.]" *Zhu,* 411 F.3d at 293, 295–96.

So too here.  Neither version of the investor visa statute supplies standards for courts to judge the agency's exercise of discretion.  Decisions about processing and prioritization are left to the Secretary.  USCIS confirms this on its website, stating that the "decision to accommodate an expedite request is within [its] sole discretion." *See Requests to Expedite Applications or Petitions*, USCIS Policy Manual, Vol. 1, Part A, Ch. 5, https://perma.cc/W4BW-B5ZE.  And it lists the criteria that it considers, including financial consequences, emergencies, other urgent humanitarian reasons, and more.  *See id.*  In other words, the decision to grant an expedite is "a matter of grace" that requires a "favorable exercise of discretion." *Patel v. Garland*, 142 S. Ct. 1614, 1619 (2022).

Because "no standards for judging the agency action are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts[.]" *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020).  The Court will therefore dismiss Count IV for failure to state a claim.[8]

---

[8]  Mukkavilli conceded that Count IV is his "weakest claim."  *See* Hr'g Tr. at 12.

**D.**

Finally, Mukkavilli argues that USCIS has unreasonably delayed a decision on his investor visa petition.  *See* Compl. ¶¶ 159–274.  He contends that a delay of about 25 months violates the APA, which requires USCIS to act "within a reasonable time."  *Id.* ¶ 117; *see also id.* ¶ 105 (stating that he petitioned for an EB-5 visa in September 2020).[9]  The Government argues that Mukkavilli fails to state a claim for unreasonable delay.  *See* MTD at 23–41.  The Court agrees with the Government.

"There is no per se rule as to how long is too long to wait for agency action[.]"  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (cleaned up).  Addressing an unreasonable delay claim is "ordinarily a complicated and nuanced task requiring consideration of particular facts and circumstances before the court."  So courts in this Circuit consider the so-called *TRAC* factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) when Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

---

[9]  The Government argues that Mukkavilli's petition has been pending for "less than two years" because the eight months during which Congress failed to reauthorize the program should not "be counted against the agency."  MTD at 29–30.  The Court is inclined to agree because USCIS lacked any authority to issue visas for regional centers during this time.  *Accord Da Costa*, 2022 WL 17173186, at *6 (collecting cases holding the same).  But even if the petition has been pending for more than two years, as Mukkavilli asserts, *see* Pl.'s Resp. at 28, the Court finds that the delay is not unreasonable.

(4) the effect of expediting delayed action on agency activities of a higher or competing

priority;

(5) the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to

hold that agency action is unreasonably delayed.

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

The Government suggests in supplemental briefing that courts need not conduct *TRAC* analysis if no clear, non-discretionary duty has been identified. *See* Gov't Suppl. Mem. at 2 n.1, 7. This seems right because even if the Court finds the delay unreasonable, if there is no clear, non-discretionary duty to act, there is nothing the Court may mandamus. *See, e.g.*, *Norton*, 542 U.S. at 63, n.1 ("[A] delay cannot be unreasonable with respect to action that is not required."). But even assuming the *TRAC* factors apply, Mukkavilli has stated no plausible claim for relief that USCIS unreasonably delayed adjudication of his investor visa.

## 1.

The Court first resolves a threshold objection: Mukkavilli argues that the question of unreasonable delay should not be evaluated at the motion-to-dismiss stage because it is too fact-intensive. *See* Pl.'s Resp. at 20–21. The Court disagrees.

Courts in this Circuit routinely apply the *TRAC* factors at the motion-to-dismiss stage to determine whether a plaintiff has alleged facts sufficient to state a plausible claim for unreasonable delay. *See, e.g.*, *Palakuru*, 521 F. Supp. 3d at 50 n.5 (collecting cases). Mukkavilli argues that fact disputes exist, citing several documents he obtained through FOIA. *See* Hr'g Tr.

at 4–5.[10]  While the Court has reviewed these exhibits, they do not persuade it that further

discovery is warranted here.  Mukkavilli fails to distinguish his case from other unreasonable

delay cases evaluated at the motion-to-dismiss stage.  *See* Gov't Reply at 5–6, ECF No. 16.

Mukkavilli also says this Court should not credit the Government's version of the facts in

analyzing the *TRAC* factors.  *See* Pl.'s Resp. at 21.  The Court treats his allegations as true, as it

must.  But it may take judicial notice of information posted on official government websites

without transforming the Government's motion into one for summary judgment.  *See, e.g.*,

*Dastagir v. Blinken*, 557 F. Supp. 3d 160, 163 n.3 (D.D.C. 2021).

The Court analyzes the *TRAC* factors in groups.

## 2.

The first and second *TRAC* factors assess "whether the agency's response time complies

with an existing specified schedule and whether it is governed by an identifiable rationale."  *Ctr.*

*for Sci. in the Pub. Int. v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014).  These two factors are

"typically considered together," *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 317 (D.D.C. 2020),

though the first is the "most important," *In re Core Commc'ns, Inc.*, 531 F.3d at 855.

Recall that USCIS manages investor visa petitions using an "availability approach,"

prioritizing petitions for aliens from countries with available visas.  *See* Processing

Announcement.  Then, when visas are available for investors from a certain country, the "first-in,

first-out" method kicks back in.  *See* Questions and Answers.  This is an identifiable rationale.

And it makes sense based on USCIS's priorities, which include efficiency and processing

---

[10]  As the Government notes, some of these documents are appended to Mukkavilli's original
Complaint and others are attached to his Opposition.  *See* Gov't Reply at 4, n.2, ECF No. 16
(listing exhibits).  None are attached to his Amended Complaint.  They are thus arguably not
properly before the Court now.

investor visas from "traditionally underrepresented countries."  MTD at 25.  This Court echoes a growing chorus holding that USCIS's investor visa adjudication process is governed by a rule of reason.  *Accord Palakuru*, 521 F. Supp. 3d at 51; *see also DaCosta*, 2022 WL 17173186, at *8 (collecting authorities holding the same).

Mukkavilli argues that Congress wants visas adjudicated within 180 days.  *See* Compl. ¶ 191.  He cites 8 U.S.C. § 1571(b) in support, which states that "[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application."  *Id.*; *see also* Pl.'s Reply at 34.  But a "sense of Congress resolution is not law."  *Emergency Coal. to Def. Educ. Travel v. Dep't of Treasury*, 545 F.3d 4, 14 n.6 (D.C. Cir. 2008).  Mukkavilli thus wisely concedes that this provision is "not mandatory."  Compl. ¶ 193; *see also id.* ¶ 194 (calling the provision a "legislative aspiration").  Several courts agree.  *See, e.g.*, *Skalka*, 246 F. Supp. 3d at 153–54; *Palakuru*, 521 F. Supp. 3d at 51–52.  Even if this provision provides some "indication of the speed with which [Congress] expects the agency to proceed," *TRAC*, 750 F.2d at 80, it does not change the Court's rule-of-reason analysis.

Mukkavilli levies a few other counterarguments.  *First*, he claims that USCIS lacks a rule of reason because it "systemically prioritizes later filed petitions over earlier filed petitions."  Compl. ¶¶ 167–68.  And he argues that investor visa petitions filed after his have already been decided because of USCIS's visa expedites for the Tryon Center.  *See id.* ¶¶ 176, 183–84.  But he provides no factual support for these conclusory assertions.  Nor does he allege that other immigrants from his country with later-filed petitions were expedited ahead of him.  And, as explained, USCIS informed Mukkavilli that it had mistakenly expedited some visas tied to Tryon.  *See* USCIS Letter.  This does not disturb the Court's conclusion that USCIS processes

investor petitions reasonably.  *See, e.g.*, *Iqbal*, 556 U.S. at 678 (explaining courts need not credit unsupported allegations).  A few mistakes do not invalidate a reasoned system.

*Second*, Mukkavilli raises several complaints about transparency.  For example, he argues that USCIS improperly relies on unspecified "other factors" to prioritize investor visa petitions.  *See* Compl. ¶ 170 (citing Questions and Answers).  And he argues that the agency does not explain how cases are assigned to an adjudicator.  *See id.* ¶ 171.  But the fact that USCIS does not explain how cases are assigned to an adjudicator is not dispositive of whether its method of processing petitions is reasonable.  Besides, USCIS explains on the same website Mukkavilli cites that another factor is whether the investor's "underlying project has been reviewed."  *See* Questions and Answers.

*Third*, Mukkavilli points to USCIS's slow pace in adjudicating investor visas.  *See* Compl. ¶¶ 177–81.  He argues that because the agency is processing "historically low" numbers of petitions despite increasing its staff, its processing method must be unreasonable.  *See id.* ¶¶ 179–82.  This logic does not follow.  While a backlog certainly exists, *see, e.g.*, *USCIS Announces New Actions to Reduce Backlogs*, USCIS, https://perma.cc/NBW4-6ZAQ, USCIS is working to combat it, *see, e.g.*, *id*.  Indeed, its shift to the visa availability approach was one response.  *See* Processing Announcement.  More, courts have regularly found that waiting times like Mukkavilli's are not unreasonable.  *See, e.g.*, *Palakuru*, 521 F. Supp. 3d at 52 (collecting cases).

In sum, *TRAC* factors one and two favor USCIS.

### 3.

Next up is the fourth *TRAC* factor, or the "effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  Here, the D.C. Circuit has

underscored that courts should assess whether USCIS is juggling competing priorities with limited resources.  *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100–02 (D.C. Cir. 2003).  For courts "have no basis for reordering agency priorities."  *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991).  The Circuit has thus "refused to grant relief," despite all the other *TRAC* favors favoring it, when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." *Id.*

So too here.  Were the Court to compel USCIS to adjudicate Mukkavilli's petition, it would move him ahead of other similarly-situated investors simply because he sued.  More, forcing the agency to act on his petition when there are no investor visas for Indian nationals, *see supra* Part I.B (discussing the Visa Bulletins), raises significant separation of powers concerns, *see Ferriero*, 60 F.4th at 715 (noting that separation of powers may counsel against mandamus relief).  This is so because Congress has capped the number of employment-based visas available, *see* 8 U.S.C. § 1151(d), and the number of visas available per country, *see id.* § 1152(a)(2).  And there are no more investor visas available to Indian nationals.  *See supra* Part I.B.  So not only would an order move Mukkavilli ahead in line, it would also command USCIS to exceed the country caps Congress prescribed.

Mukkavilli's counterarguments are unpersuasive.  *First*, he claims that compelling action on his petition would not move him to the front of the line because there is no line.  *See* Compl. ¶¶ 221–23.  Rather, according to Mukkavilli, USCIS has a "pool" of investor visa petitions, which it decides in an "arbitrary order."  *Id.* ¶ 221.  Not so.

As explained, USCIS processes petitions reasonably by prioritizing investors whose countries have available visas.  *See supra* Part III.A.2.  Then, it uses a first-in, first-out approach.

*See id*.  So compelling USCIS to act on his petition would allow him to jump the line of other Indian nationals who invested in a regional center who filed petitions earlier.

*Second*, he argues that USCIS already prioritizes regional center petitions for investors. *See* Compl. ¶ 216.  Maybe so, but USCIS also prioritizes petitions based on whether visas are available to investors from particular countries, and there are none for India.

*Third*, Mukkavilli contends that compelling action on his petition will not interfere with agency priorities because the agency could process all petitions if it wished to.  *See id.* ¶¶ 208–15.  This is unpersuasive.  Mukkavilli offers no support for this assertion beyond his opinion that USCIS is moving slower than necessary given its resources.

*Fourth*, and finally, Mukkavilli claims that the regional center program "never lapsed" and accuses USCIS of improperly focusing on immigration investigations rather than adjudications.  *See id.* ¶¶ 242–61.  The Court is hard-pressed to understand how these arguments relate to the *TRAC* analysis.  And as USCIS points out, they suffer from factual and logical inconsistencies.  *See* MTD at 30–31.

In sum, granting Mukkavilli the relief he seeks would interfere with agency priorities, move him ahead of similarly situated investors, and potentially violate the separation of powers. The fourth *TRAC* factor thus decisively favors USCIS.

**4.**

The Court looks next to *TRAC* factors three and five.  These involve "the interests prejudiced by delay," including the impact on "human health and welfare."  *TRAC*, 750 F.2d at 80.  Mukkavilli argues that he cannot travel or tend to his parents, and that the delay has caused his family anxiety and stress.  *See* Compl. ¶¶ 119–20.  He also claims that he passed up other

employment-visa opportunities because he thought his investor visa would be processed quickly. *See id.* ¶ 121.  And he explains that he lost almost a million dollars.  *See id.* ¶ 122.

The Court has no doubt that Mukkavilli has an interest in prompt adjudication.  But many other investors do too.  More, to receive an investor visa, Mukkavilli knew that he had to put his money "at risk."  *See, e.g.*, 8 C.F.R. § 204.6.  At most, factors three and five only slightly favor finding an unreasonable delay.  Even so, they do not tip the balance against the other factors that favor the Government.  *Accord Palakuru*, 521 F. Supp. 3d at 53.  USCIS juggles competing priorities when it adjudicates visas, including congressionally mandated country and program limits.  Mukkavilli's individual interests do not overcome these systemic interests.

**5.**

Finally, the sixth *TRAC* factor is neutral.  It instructs courts that they "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"  *TRAC*, 750 F.2d at 80.  Mukkavilli argues that USCIS "promised expedited treatment" for his investor visa, but then cancelled the expedite without notice.  Compl. ¶ 268.

The Court finds this bad-faith argument unpersuasive for a few reasons.  First, Mukkavilli alleges it was the center's website that promised him that his petition would be expedited, not USCIS.  *See id.* ¶¶ 99–103; *see also* EB-5 Fast, https://perma.cc/4S22-F5KH.  Second, one of Mukkavilli's exhibits shows that USCIS notified him that it was not going to expedite his petition, and that past expedites had been mistakes.  *See* USCIS Letter.  Perhaps wisely, Mukkavilli drops these arguments in support of the sixth factor in his opposition.  *See generally* Pl.'s Resp.

The sixth factor is thus neutral and does not alter the Court's analysis.

**IV.**

In sum, the Court will dismiss Mukkavilli's unlawful withholding claims (Counts I–III) for lack of jurisdiction.  And he fails to state a claim for Count I.  The Court will also dismiss Mukkavilli's claim that USCIS arbitrarily refused to expedite his petition for failure to state a claim because that decision was committed to agency discretion by law (Count IV).  Finally, the Court finds that Mukkavilli states no claim for unreasonable delay under the *TRAC* factors (Count V).  Because Mukkavilli is not a "prevailing party," 28 U.S.C. § 2412, his request for attorney's fees under the Equal Access to Justice Act, *see* Compl. ¶¶ 275–78, will be denied.  For these reasons, the Court will grant the Government's Motion to Dismiss.  A separate Order will issue today.

Dated:  June 15, 2023

_____
TREVOR N. McFADDEN, U.S.D.J.